UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Upsher-Smith Laboratories, Inc.,

Plaintiff,

v.

Pan American Laboratories, Inc., and
Metabolite Laboratories, Inc.,

Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 01-352 ADM/AJB

---

Christopher J. Sorenson, Esq., and Jacob M. Holdreith, Esq., Robins, Kaplan, Miller & Ciresi, LLP, Minneapolis, MN, appeared for and on behalf of Plaintiff.

Glenn K. Beaton, Esq., Gibson, Dunn & Crutcher, LLP, Denver, CO, and Randy G. Gullickson, Esq., Anthony, Ostlund & Baer, PA, Minneapolis, MN, appeared for and on behalf of Defendants.

---

## I. INTRODUCTION

On May 13, 2002, the Motion to Dismiss [Doc. No. 32] of Defendant Metabolite Laboratories, Inc. ("Metabolite"), and the Motion to Dismiss Declaratory Judgment Claims and Abuse of Patent Rights Claim [Doc. No. 33] of Defendant Pan American Laboratories, Inc. ("PAL"), were argued before the undersigned United States District Judge. For the reasons set forth below, the Motion to Dismiss is granted.

## II. BACKGROUND

Metabolite was organized by two University of Colorado Medical School (the "University") hematology professors, Dr. Robert H. Allen ("Dr. Allen") and Dr. Sally P. Stabler ("Dr. Stabler"), to license the Professors' patents on treatments involving vitamins $B_{12}$ and folate to pharmaceutical companies, and to contract with the University for the performance of certain

FILED SEP - 4 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD SEP - 4 2002
DEPUTY CLERK

laboratory assays on body fluids for hospitals and clinics. Allen Decl. ¶¶ 3-4. PAL developed a vitamin pill, called "Foltx," containing a formulation of vitamins $B_{12}$ and folate covered by the Professors' patents, and acquired a license for the product from Metabolite in exchange for royalties. Under the license agreement, PAL has no right to sue other companies for infringement of the Professors' patents. Id. ¶¶ 5-6, Ex. 2 § 6.02.

Upsher-Smith Laboratories, Inc. ("Upsher") is a competitor of PAL who approached the Professors through a consultant, Kevin M. Garnett. In September 2000, the consultant telephoned Dr. Allen in Colorado and stated that he represented an unnamed pharmaceutical company interested in a license to the Professors' patents. Dr. Allen responded that Metabolite "would consider granting a license under appropriate terms and conditions," and indicated in writing that licensing was "a definite possibility." Id. ¶ 8; O'Neill Aff. Ex. A.

On November 29, 2000, Vickie O'Neill ("O'Neill"), Vice President of Business Development of Upsher, contacted Dr. Allen in Colorado directly by telephone from Minnesota. Allen Decl. ¶ 9. Upsher and Metabolite entered into a confidentiality agreement to discuss ideas about Upsher's product, Folgard Rx, and a license arrangement. After several telephone conversations, O'Neill and Dr. Allen agreed on the outlines of a potential license to a vitamin formulation that would not violate the existing license to PAL, and established a royalty rate identical to the rate in Metabolite's agreement with PAL. Id. ¶ 11. A draft agreement was prepared by Metabolite's Colorado counsel and forwarded to Upsher. Upsher did not object to the Colorado choice of law or venue provisions in this draft. Id. ¶ 12.

Prior to the creation of this draft agreement, Upsher attended the American Heart Association convention in New Orleans, Louisiana, from November 12-15, 2000. At the

convention, Upsher announced its intent to bring Folgard Rx to the market. O'Neill Aff. ¶ 2. A representative of PAL attending the convention learned about the Folgard Rx product. Upsher alleges that the PAL representative told the Upsher representative that he personally knew the owner of the Metabolite patents under which the PAL product, Foltx, was licensed, and was aware that the patent owner planned to bring suit against Upsher for infringement after Folgard Rx gained a market share. Ziegeweid Aff. ¶ 4. On November 21, 2000, President and CEO of PAL, Samuel M. Camp, notified Upsher Chairman and CEO Ken Evenstead that it understood Folgard Rx to contain vitamin formulations of $B_{12}$ and folic acid, inter alia, covered by the Metabolite patents, of which PAL was an exclusive licensee. Robbins Aff. Ex. A. His letter stated: "It would appear that your plans for Folgard Rx™ are in violation of several claims of the [Metabolite patents], and potentially in violation of several continuations and divisionals thereof." Id. PAL asked that Upsher review the relevant patents, and stated that its letter should serve as notice of a "potential violation" of those patents. Id. Upsher alleges that, because Metabolite negotiated with Upsher for a license to its patents with knowledge of PAL's infringement charge, Upsher was under a reasonable apprehension that it would be sued.

Finding the draft agreement prepared by Metabolite unacceptable, Upsher sent a counter-proposal to Dr. Allen on December 22, 2000. O'Neill Aff. ¶ 10. Upsher's counter-proposal sought either exclusivity with respect to certain prescription products combining folic acid, $B_6$ and $B_{12}$, or a royalty rate less than that which PAL was paying. Allen Decl. ¶ 13, Ex. 4. Dr. Allen notified Upsher that these proposals were unacceptable. Id. ¶ 13. Subsequent telephone conversations between O'Neill at Upsher and Dr. Allen occurred, but no agreement was ever reached. Id. ¶ 14; O'Neill Aff. ¶¶ 11-13. Dr. Allen asserts that at no time did Metabolite ever

threaten suit against Upsher. Allen Decl. ¶ 15. O'Neill argues that because Dr. Allen did not tell her that PAL had no authority to sue alleged infringers of the Metabolite patents, and did not "repudiate the allegations of infringement and threats of litigation" made by PAL, she believed Upsher was under threat of suit.[1] O'Neill Aff. ¶¶ 6, 13-14.

On February 1, 2001, Upsher put its Folgard Rx product on the market, and filed a complaint for declaratory judgment of non-infringement, invalidity and unenforceability of U.S. patents against PAL and Metabolite on February 26, 2001.

## III. DISCUSSION

### A. Motion to Dismiss Standard

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss claims for lack of jurisdiction over the person (Fed. R. Civ. P. 12(b)(2)), or for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss, the pleadings are construed in the light most favorable to the non-moving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993). Any uncertainties concerning the sufficiency of the claims must be resolved in favor of the non-moving party. Ossman, 825 F. Supp. at 880.

A complaint should be dismissed "only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations." Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995) (citations omitted); Hafley v. Lohman, 90 F.3d

[1] Whether or not Upsher believed they were under threat of suit is a question pertinent only to subject matter jurisdiction and has no bearing on personal jurisdiction analysis.

264, 266 (8th Cir. 1996). "A motion to dismiss should be granted as a practical matter . . . only in the unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." Frey, 44 F.3d at 671.

If matters outside the pleading are considered, a 12(b)(6) motion "shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed. R. Civ. P. 12(b). Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

**B. Metabolite's Motion to Dismiss for Lack of Personal Jurisdiction**

**1. Personal Jurisdiction Standard**

A plaintiff need only make a prima facie showing of personal jurisdiction over the defendant to survive a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2). Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd., 89 F.3d 519, 522 (8th Cir. 1996). In evaluating the prima facie showing, the court must view the evidence in the light most favorable to the plaintiff, and resolve all factual conflicts in the plaintiff's favor. Id.

Personal jurisdiction in a patent infringement or patent declaratory judgment action is determined by the law of the Federal Circuit, rather than that of the regional circuits. Red Wing

Shoe Co. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1358 (Fed. Cir. 1998). To establish personal jurisdiction, the facts presented must satisfy the requirements of the forum state's long-arm statute, and the exercise of personal jurisdiction over the defendant must not violate Due Process. Id. Because Minnesota's long-arm statute, Minn. Stat. § 543.19 (1988), extends jurisdiction to the maximum limit consistent with Due Process, this court need only evaluate whether the requirements of Due Process are satisfied. Id.; see also Wessels, Arnold & Henderson v. National Med. Waste, Inc., 65 F.3d 1427, 1431 (8th Cir. 1995).

Due Process mandates that a court exercise personal jurisdiction over a non-resident defendant only when the defendant has "certain minimum contacts" with the state such that summoning the defendant to the forum state does not offend "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). Sufficient contacts exist when the defendant's conduct and connection with the forum state are such that the defendant should "reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). The defendant's acts must be substantial enough to give clear notice that it would be subject to suit in the forum state. Id. However, the unilateral activities of one claiming some relationship with the non-resident defendant are not enough to satisfy the minimum contacts requirement. Hanson v. Denckla, 357 U.S. 235, 253 (1958). In every case there must be some act by which a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Id. Jurisdiction is proper where the contacts proximately result from actions by the defendant that create a "substantial connection" with the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985).

Specific jurisdiction is jurisdiction over causes of actions arising from or related to a defendant's actions within the forum state, while general jurisdiction refers to the power of a state to adjudicate any cause of action involving a particular defendant regardless of where the cause of action arose. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 nn. 8-9 (1984). Where a forum state seeks specific personal jurisdiction over a non-resident defendant, Due Process is satisfied if the defendant has "purposely directed" his activities at residents of the forum, and the litigation results from alleged injuries that "arise out of or relate to" those activities, even if those activities are "isolated and sporadic." Burger King, 471 U.S. at 472-73; Red Wing, 148 F.3d at 1359. A single transaction with the forum state can be sufficient to establish personal jurisdiction over a defendant, so long as it creates a "substantial connection" with the forum, as opposed to an "attenuated affiliation." Red Wing, 148 F.3d at 1359. General jurisdiction exists over a defendant whose contacts with a forum are "continuous and systematic," even when the cause of action has no relation to those contacts. Id. In any event, "random," "fortuitous," or "attenuated" contacts do not count in the minimum contacts calculus. Burger King, 471 U.S. at 475.

The Federal Circuit uses a three-factor test to determine whether asserting jurisdiction over an out-of-state defendant comports with Due Process. The three factors are: (1) whether the defendant "purposefully directed" its activities at residents of the forum; (2) whether the claim "arises out of or relates to" the defendant's activities with the forum; and (3) whether assertion of personal jurisdiction is "reasonable and fair." Inamed Corp. v. Kuzmak, 249 F.3d 1356, 1360 (Fed. Cir. 2001). The first two factors correspond with the "minimum contacts" prong of the

Due Process analysis, where burden of proof is on the plaintiff, while the third factor corresponds with the "fair play and substantial justice" prong, where the burden of proof is on the defendant to demonstrate the presence of other considerations that render the exercise of jurisdiction unreasonable. Id.

**2. Application of the Standard**

Metabolite does not do business in Minnesota, has not registered to conduct business in Minnesota, has no offices, facilities or equipment in Minnesota, has never advertised in Minnesota, has not established a website accessible in Minnesota, has never had any employees in Minnesota, and has never had any representatives or distributors in Minnesota. Allen Decl. ¶ 18. Metabolite's only Minnesota customer is the Mayo Clinic, for whom Metabolite does assay work. Id. ¶ 19. Metabolite argues the assay procedures are all performed in Colorado, and are unrelated to the patents at issue.

Upsher argues the requirements for specific jurisdiction are satisfied by (1) the telephone calls and faxes between Metabolite in Colorado and Upsher in Minnesota, (2) the mutual confidentiality agreement signed between Metabolite and Upsher, and (3) Metabolite's conducting negotiations with Upsher for a license by sending a proposed license agreement to Upsher in Minnesota. Pl. Mem. in Opp'n at 12. The Eighth Circuit has held repeatedly that use of interstate mail or telephone alone is insufficient to establish minimum contacts with the forum state. See Krambeer v. Eisenberg, 923 F.Supp. 1170, 1174 (D. Minn. 1996) (citing Bell Paper Box, Inc. v. Trans Western Polymers, Inc., 53 F.3d 920, 923 (8th Cir. 1995); T.J. Raney & Sons, Inc. v. Security Sav. & Loan Ass'n, 749 F.2d 523, 525 (8th Cir. 1984); Mountaire Feeds, Inc. v. Agro Impex, S.A., 677 F.2d 651, 656 (8th Cir. 1982)). Interstate communication such as use of

telephone and mail is a "secondary or ancillary" factor. Bell Paper, 53 F.3d at 923. The telephone contacts constituting the license negotiations between Metabolite and Upsher were instigated by Upsher. O'Neill Tr. at 64 lines 20-23. Dr. Allen did not initiate this contact, and did not telephone Upsher except to return phone calls received. Id. at 137 lines 15-23, 138 lines 189-21. Metabolite did not "purposefully direct" its activities at residents of the forum. Moreover, the existing contacts were sporadic and few, totaling only "two or three" actual conversations. Robbins Tr. at 51 lines 6-8. "[C]ontacts resulting from the 'unilateral activity' of others do not count" in personal jurisdiction analysis. Red Wing, 148 F.3d at 1359.

The mutual confidentiality agreement is not sufficient to establish jurisdiction. While the confidentiality agreement has a Minnesota choice-of-law provision, the present lawsuit does not arise out of this agreement. O'Neill Tr. at 98 lines 8-11. "If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer is clearly that it cannot." Burger King, 471 U.S. at 478. Accordingly, the discussions which occurred while the parties unsuccessfully attempted to reach a license agreement cannot establish jurisdiction. The mailing of a draft contract into a state falls short as well. The requirements for specific jurisdiction are simply not met.

Upsher argues the requirements for general jurisdiction are satisfied by (1) Metabolite's performing blood assays for the Mayo Clinic, a Minnesota hospital, (2) Metabolite's providing technical expertise to PAL in the sale, marketing and science of Foltx, which is sold in Minnesota, and (3) Metabolite directing PAL to mark the Foltx product with the Metabolite patent numbers, including its products sold in Minnesota. Pl. Mem. in Opp'n at 12-13.

Metabolite's contacts with Minnesota fall short of being "continuous and systematic," and they do not relate to the claim at issue. Metabolite has a single assay customer in Minnesota. The Mayo Clinic sought out the services of Metabolite, and this work accounts for only about 2% of Metabolite's total yearly revenues. All assay work is unrelated to the patents at issue and is done by Metabolite in Colorado. Allen Decl. ¶ 19. No Metabolite employee or representative has any ongoing contact with Mayo, nor has anyone associated with Metabolite ever visited Mayo. Id. Metabolite's contacts with the Mayo Clinic are too attenuated to establish general jurisdiction.

In Hildebrand v. Steck Mfg. Co., 279 F.3d 1351 (Fed. Cir. 2002), the Federal Circuit found no jurisdiction over a non-resident that initiated contact with resident corporations of the forum state to offer a license, where the non-resident sent demand letters threatening litigation and initiated telephone calls, but no license resulted. Here, Metabolite did not initiate contact with Upsher, and the only arguable demand letter was sent by PAL, not Metabolite.[2]

Upsher cites no authority to support that allowing a patentee to place a patent notice on licensed products subjects the patent owner to personal jurisdiction in all states where the products are sold. Likewise, Upsher cites no authority that providing consulting assistance to a licensee selling a product in the forum subjects the patentee to personal jurisdiction. The assertion of personal jurisdiction over Metabolite in this case would be neither reasonable nor fair. Metabolite has not committed an act by which it "purposefully avail[ed] itself of the

---

[2] The language of the PAL letter, however, that "[i]t would appear that [Upsher's] plans for Folgard Rx™ are in violation of several claims of the [Metabolite patents], and potentially in violation of several continuations and divisionals thereof," suggests that it was not a demand letter threatening suit, but rather a notice of possible infringement. Robbins Aff. Ex. A.

privilege of conducting activities within [Minnesota], thus invoking the benefits and protections of its laws." Hanson, 357 U.S. at 253. The requirements for general jurisdiction are lacking. Metabolite's Motion to Dismiss for Lack of Personal Jurisdiction is granted.

### C. PAL's Motion to Dismiss Declaratory Judgment Claims and Abuse of Patent Rights Claim

As was discussed during oral argument, no declaratory judgment action can ensue without the Patent owner. While the evidence establishes that no subject matter jurisdiction exists in this case, because Metabolite and PAL did not place Upsher under reasonable apprehension of suit by Metabolite, this issue need not be reached. In light of the lack of personal jurisdiction over Metabolite, this Motion is dismissed as moot.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Metabolite's Motion to Dismiss [Doc. No. 32] is **GRANTED**, and
2. PAL's Motion to Dismiss Declaratory Judgment Claims and Abuse of Patent Rights Claim [Doc. No. 33] is **DISMISSED AS MOOT**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Date: September 4, 2002

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

**DATE MAILED TO COUNSEL/PRO SE PARTIES:**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEALNO.CIV
Rev. August 11, 1995